# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JOHN H. MEYER,        )
)
           Plaintiff,      )    Civil Action No. 2:13-cv-00109
)
v.                                )    Judge Mark R. Hornak
)
CALLERY CONWAY MARS HV, INC.,    )
t/d/b/a HERR-VOSS STAMCO, INC.,     )
)
          Defendant.     )

## OPINION

**Mark R. Hornak, United States District Judge**

This case centers on allegations that John Meyer was unlawfully discharged by his employer because of his age. The Defendant employer says that Meyer was lawfully fired because he directed the repair of a machine in a way that could have injured or killed others. Now before the Court are Defendant's motion for summary judgment (*ECF No. 29*) and its motion to exclude evidence pertaining to damages (*ECF No. 33*). In connection with its motion requesting the exclusion of evidence, the Defendant also asks for an award of attorney's fees as a sanction. ECF No. 33 at 16, ¶ 50. Because a jury could conclude that the Defendant applied a discriminatory "double standard" in choosing to fire the Plaintiff, the motion for summary judgment will be denied. The Defendant's motion to exclude Plaintiff's evidence pertaining to damages will be granted in part. The Defendant's request for an award of attorney's fees for Plaintiff's discovery misbehavior will be granted in part.

## I.    BACKGROUND

John H. Meyer ("Meyer") was born on January 4, 1957. ECF Nos. 31 & 40 at ¶ 2. Callery Conway Mars HV, Inc., t/d/b/a Herr-Voss Stamco, Inc. ("Herr-Voss"), is a corporation

specializing in the construction of precision leveling equipment. *Id.* at ¶ 3. Meyer started to work as a "C" machinist for Herr-Voss in 1975. *Id.* at ¶ 4. He held various positions with Herr-Voss throughout the next seventeen years. *Id.* at ¶¶ 5-7. On October 9, 1992, Meyer left his position with Herr-Voss in order to pursue self-employment in the construction industry. *Id.* at ¶ 8. At the time of his resignation, Meyer was working as a maintenance technician. *Id.* at ¶¶ 7-8.

After roughly twelve years away, Meyer pursued another employment opportunity with Herr-Voss. ECF Nos. 31 & 40 at ¶¶ 9-10. On September 6, 2004, he received and accepted an offer to work as a 5" mill operator at Herr-Voss' Mill Rolls facility in Ambridge, Pennsylvania. *Id.* at ¶ 10. Meyer was promoted to the position of machine shop supervisor on October 12, 2005. *Id.* at ¶ 12. As a part of that promotion, he received a twenty percent increase in his pay. *Id.* at ¶ 14. Meyer was transferred to Herr-Voss' facility in Callery, Pennsylvania. *Id.* During the next three years, Meyer's pay was incrementally increased based on merit. *Id.* at ¶ 15. On June 1, 2009, Meyer was promoted to the position of plant manager. *Id.* at ¶ 16. His pay was increased by ten percent in order to account for the additional responsibilities that he had assumed. *Id.* at ¶ 18. Meyer also received additional pay increases in 2010 and 2011. *Id.* at ¶ 21.

This case centers on a problem in May 2012 with one of the Defendant's products, the Voss Enhancing Leveler ("VEL") machine. ECF No. 31 at ¶ 22. Bill Streed ("Streed"), a 6" CNC operator who reported to Meyer, discovered that the third VEL machine manufactured by Herr-Voss had an oversized key slot. ECF Nos. 31 & 40 at ¶ 29. That defect, if left uncorrected, would have rendered the VEL machine unfit for use. *Id.* at ¶ 30. Streed notified Meyer of the defect in April 2012. *Id.* at ¶ 29. Meyer sent the key slot to Herr-Voss' welding shop and

instructed a subordinate to weld the key slot in a manner that would allow it to be "remachined." *Id.* at ¶ 36.

Meyer's immediate supervisor was Wally Markle ("Markle"), who served as Herr-Voss' production manager. ECF Nos. 31 & 40 at ¶ 43. Markle noticed that the key slot was in the welding shop and inquired as to why it was there. *Id.* at ¶¶ 43-44. Meyer responded to Markle's inquiry by stating that the key slot had been incorrectly "machined" and needed to be fixed. *Id.* at ¶ 45.

During the relevant period of time, James McKenna ("McKenna") served as Herr-Voss' President of Coil Solutions. ECF No. 1 at ¶ 9. Mark Menego ("Menego") was the lead engineer working on the VEL project. ECF No. 31 at ¶ 47. At 4:32 P.M. on Tuesday, May 1, 2012, Menego emailed McKenna the following message:

> Found out this afternoon that the shop had a problem machining the key slot on one of the yoke ends for one of the VELs.
>
> As I understand it the machine tool lost position and the key slot was off by .011"
>
> Nobody from engineering or the VEL Team were notified of this!
>
> The shop decided to weld the key slot so they could remachine it, photos attached.
>
> I am not in favor of this repair.
>
> Given the load that this connection carries I have major concerns about using a piece repaired in this manner.
>
> Had we been given notice, we could have considered other alternatives and saved the piece.
>
> However, as it stands now, the part should be scrapped.

ECF No. 32-5 at 9-10. McKenna forwarded Menego's message to Meyer and Markle the next morning, asking that they explain who was responsible for the incorrect repair decision and provide the applicable "replacement cost in material and labor." *Id.* at 9.

In a response sent to McKenna on the morning of May 3, 2012, Meyer acknowledged that he had made the decision after discussing it with Markle and his "staff." ECF No. 32-5 at 8. Meyer further stated that "final machining" would be conducted "to return the part to the drawing dimensions." *Id.*

McKenna quickly responded to Meyer's message by emailing him the following instructions:

> Do not put back up on the mill. You are NOT authorized to determine the proper fixes for machining errors without consulting the responsible engineer.

*Id.* A few hours later, Markle notified McKenna that the total cost of replacing the defective VEL machine would be $7,312.80. *Id.*

Kip Mostowy ("Mostowy"), the President and Chief Executive Officer ("CEO") of Herr-Voss, learned of the situation while speaking with McKenna. ECF No. 32-2 at ¶ 14. Menego later informed Mostowy that Meyer's attempted repair of the VEL machine "could have had severe and dangerous consequences." *Id.* at ¶ 18. The conversation left Mostowy with the impression that Meyer had violated certain policies that Herr-Voss had in place to ensure the safety of its workers and customers. *Id.* at ¶¶ 21-26. Mostowy ultimately decided to terminate Meyer's employment with Herr-Voss. *Id.* at ¶¶ 27-28.

At the time of Meyer's discharge, Craig Burkhart ("Burkhart") served as Herr-Voss' Human Resources Manager. ECF Nos. 31 & 40 at ¶ 71. Kathleen Kaper ("Kaper") was Burkhart's assistant. *Id.* at ¶ 72. The messages exchanged between Menego, McKenna, Meyer, and Markle were forwarded to Burkhart on the morning of May 7, 2012. ECF No. 32-1 at 63. McKenna, who forwarded the email chain to Burkhart, added a notation reading, "For your file." *Id.* On May 8, 2012, Burkhart and Kaper met with Meyer and informed him of his discharge. ECF Nos. 31 & 40 at ¶ 72. During the encounter, Meyer expressed his disagreement with the

termination decision and stated that he would speak with an attorney about the matter. *Id.* at ¶ 73.

Meyer was fifty-five years old at the time of his termination. ECF Nos. 31 & 40 at ¶ 2. Herr-Voss says that he was replaced by Larry Bennett ("Bennett"). *Id.* at ¶ 82. Bennett, who was born on April 10, 1961, was fifty-one years old when he assumed Meyer's prior duties. *Id.* at ¶ 84.

Meyer filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on May 30, 2012, alleging that Herr-Voss had violated the Age Discrimination in Employment Act of 1967 ("ADEA") by discharging him because of his age. ECF No. 32-1 at 66-68. At that time, Gregory Santillo ("Santillo") served as Herr-Voss' Director of Engineering and Sales. ECF No. 59 at 24.

McKenna forwarded the earlier email chain to Santillo at 1:16 P.M. on June 26, 2012. ECF No. 32-1 at 63. In a response emailed to McKenna at 3:54 P.M. that same day, Santillo stated as follows:

> To expand on Mark Menego's below email; the subject key slot is vital to the structural integrity of the machine. The force that is on the key slot is 3 ½ million pounds and the frame weighs 60,000 lbs. If that area had a failure the frame would be in an uncontrollable state and would free fall. This would present a very hazardous safety situation.

*Id.* Menego died at some point after Meyer's discharge.[1] ECF No. 59 at 22-23; ECF No. 60 at 52-53.

On October 29, 2012, the EEOC dismissed Meyer's charge of discrimination and provided him with written notice of his right to sue Herr-Voss under the ADEA within ninety days. ECF No. 1 at ¶ 6(B). Meyer commenced this civil action against Herr-Voss on January

---

[1] The record does not reveal the date of Menego's death. ECF No. 56 at 8-9; ECF No. 59 at 22-23. It is not clear whether he died before or after June 26, 2012.

22, 2013, asserting claims under both the ADEA and the Pennsylvania Human Relations Act ("PHRA") [43 PA. STAT. § 951 *et seq.*]. ECF No. 1. Herr-Voss moved for summary judgment on March 14, 2014. ECF No. 29. On April 7, 2014, Herr-Voss filed a motion requesting the exclusion of evidence concerning the damages suffered by Meyer as a result of his discharge. ECF No. 33. The Court entertained oral argument on June 17, 2014. ECF No. 55. The motions filed by Herr-Voss are now ripe for disposition.

## II.    **STANDARD OF REVIEW**

Summary judgment may only be granted where the moving party shows that there is no genuine dispute as to any material fact, and that a judgment as a matter of law is warranted. FED. R. CIV. P. 56(a). Pursuant to Federal Rule of Civil Procedure 56, the Court must enter summary judgment against a party who fails to make a showing sufficient to establish an element essential to his or her case, and on which he or she will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In evaluating the evidence, the Court must interpret the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in his or her favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007).

The burden is initially on the moving party to demonstrate that the evidence contained in the record does not create a genuine issue of material fact. *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 140 (3d Cir. 2004). A dispute is "genuine" if the evidence is such that a reasonable trier of fact could render a finding in favor of the nonmoving party. *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). Where the nonmoving party will bear the burden of proof at trial, the moving party may meet its burden by showing that the admissible evidence contained in the record would be insufficient to carry the nonmoving party's burden of proof. *Celotex*, 477 U.S. at 322.

6

Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond his or her pleadings and designate specific facts by the use of affidavits, depositions, admissions or answers to interrogatories showing that there is a genuine issue of material fact for trial. *Id.* at 324. The nonmoving party cannot defeat a well-supported motion for summary judgment by simply reasserting unsupported factual allegations contained in his or her pleadings. *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989).

## III.   JURISDICTION AND VENUE

The Court has jurisdiction over Meyer's ADEA claim pursuant to 28 U.S.C. § 1331. Supplemental jurisdiction over Meyer's PHRA claim is predicated on 28 U.S.C. § 1367(a). Venue is proper under 28 U.S.C. § 1391(b).

## IV.   DISCUSSION

The ADEA declares it to be "unlawful" for a covered employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Statutory protection from discrimination extends to individuals who have reached the age of forty. 29 U.S.C. § 631(a). In order to establish a violation of the ADEA, Meyer must show that his age had a "determinative influence" on Herr-Voss' decision to discharge him. *Glanzman v. Metro. Mgmt. Corp.*, 391 F.3d 506, 512 (3d Cir. 2004). In essence, Meyer must demonstrate that his age was a "but-for" cause of his discharge. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175-80 (2009). In a disparate-treatment case such as this, a violation of the ADEA cannot be premised solely on differential treatment based on a factor that is "analytically distinct" from age. *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 608-13 (1993).

In *General Dynamics Land Systems, Inc. v. Cline*, 540 U.S. 581, 584 (2004), the Supreme Court held that the ADEA did not prohibit covered employers from discriminating against younger individuals in favor of older individuals. Speaking through Justice Souter, the Supreme Court explained that the word "age," as used in the ADEA's anti-discrimination provision, essentially meant "old age." *Gen. Dynamics*, 540 U.S. at 596. Given the holding in *General Dynamics*, the ADEA "does not prohibit discrimination which disfavors younger individuals, even where such younger individuals are within the class of persons entitled to [statutory] protection." *Venter v. Potter*, 694 F. Supp. 2d 412, 419 n.1 (W.D. Pa. 2010). Nonetheless, Meyer does not necessarily have to show that he was replaced by a younger individual in order to establish a violation of the ADEA. *Pivirotto v. Innovative Systems, Inc.*, 191 F.3d 344, 353-57 (3d Cir. 1999). Meyer can prevail by demonstrating that Herr-Voss terminated him "for a reason for which it would not have terminated a younger employee." *Fitzpatrick v. Nat'l Mobile Television*, 364 F. Supp. 2d 483, 491 n.4 (M.D. Pa. 2005).

The PHRA declares it to be an "unlawful discriminatory practice" for a covered employer "to bar or to discharge" an individual from employment because of his or her age. 43 PA. STAT. § 955(a). The term "age," as used in the PHRA, is specifically defined to include the same individuals enjoying statutory protection under the ADEA. 43 PA. STAT. § 954(h). It is undisputed that Herr-Voss is an "employer" covered by the ADEA and the PHRA. 29 U.S.C. § 630(b); 43 PA. STAT. § 954(b). The Pennsylvania courts ordinarily construe the provisions of the PHRA to be coterminous with their federal counterparts.[3] *Stultz v. Reese Bros., Inc.*, 835 A.2d 754, 759 (Pa. Super. Ct. 2003). Consequently, the Court's analysis of Meyer's ADEA

---

[3] "The provisions of the PHRA are typically construed to be coterminous with parallel federal anti-discrimination provisions unless a difference in the applicable statutory language indicates that a different construction is warranted." *Howard v. Blalock Elec. Serv., Inc.*, 742 F. Supp. 2d 681, 688 (W.D. Pa. 2010).

claim will likewise be dispositive of the claim arising under the PHRA. *Johnson v. McGraw-Hill Cos.*, 451 F. Supp. 2d 681, 692 (W.D. Pa. 2006).

## A.    The Applicable Burden-Shifting Framework

Since this is an employment discrimination case in which no "direct evidence" of unlawful discrimination is presented, the Supreme Court's analyses in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981), provide the formulation for allocating the requisite burdens of proof and production for purposes of the pending motion for summary judgment.[4]    In an employment discrimination case of this kind, the plaintiff must establish a *prima facie* case of illegal discrimination. *McDonnell Douglas*, 411 U.S. at 802.    If a *prima facie* case of discrimination is established, the defendant must articulate a legitimate, nondiscriminatory reason for treating the plaintiff in an adverse manner. *Id.* at 802-03.    If the defendant articulates a legitimate, nondiscriminatory reason for the plaintiff's adverse treatment, the plaintiff must demonstrate that the reason given by the defendant for such treatment is merely a pretext for unlawful discrimination. *Id.* at 804-05.    Evidence suggesting that an employer's explanation for an adverse employment action is unworthy of credence constitutes a form of circumstantial evidence that a plaintiff can use to establish that the action was taken for a discriminatory reason. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003).

The plaintiff's burden of establishing a *prima facie* case of disparate treatment is not onerous. *Burdine*, 450 U.S. at 253.    In order to establish a *prima facie* case of discrimination, the

---

[4] The *McDonnell Douglas-Burdine* burden-shifting framework does not apply in an employment discrimination case in which "direct evidence" of discrimination is presented. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002). "Direct evidence" of discrimination is evidence that is "so revealing of discriminatory animus that it is not necessary to rely on any presumption" from the plaintiff's *prima facie* case to shift the applicable burden of production to the defendant. *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1096 (3d Cir. 1995).    The evidence presented by Meyer does not constitute this sort of "direct evidence" of discrimination.

plaintiff need only show that: (1) he or she was a member of a statutorily-protected class; (2) he or she was aggrieved by an adverse employment action; and (3) the adverse employment action occurred under circumstances giving rise to an inference of illegal discrimination. *Shah v. Bank of Am.*, 598 F. Supp. 2d 596, 604 (D. Del. 2009). The specific elements of a *prima facie* case generally "depend on the facts of the particular case" before the court and "cannot be established on a one-size-fits-all basis." *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 411 (3d Cir. 1999). The *prima facie* inquiry "remains flexible and must be tailored to fit the specific context in which it is applied." *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797-98 (3d Cir. 2003).

Because the *prima facie* inquiry in any case is fact-specific, "[t]he touchstone of the inquiry is whether the circumstances giving rise to an inference of discrimination are of *evidentiary value*, not whether they fit into a mechanical formula." *Cobetto v. Wyeth Pharma.*, 619 F. Supp. 2d 142, 153 n.3 (W.D. Pa. 2007) (citing *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312-13 (1996)). A *prima facie* case "raises an inference of discrimination" sufficient to shift the burden of production to the defendant. *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978). This inference is based on an assumption that certain actions, if left unexplained, "are more likely than not based on the consideration of impermissible factors." *Id.*

If the plaintiff establishes a *prima facie* case of discrimination, the burden of production shifts to the defendant to rebut the presumption of discrimination through the introduction of admissible evidence indicating that the challenged employment action was taken for a legitimate, nondiscriminatory reason. *Burdine*, 450 U.S. at 254-55. To sustain this burden, the defendant does not have to persuade the court that it was "actually motivated" by the proffered reason. *Id.* at 254. The inquiry as to whether the defendant has met its burden of production "can involve no credibility assessment," since "the burden-of-production determination necessarily *precedes* the

credibility-assessment stage." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993). The defendant satisfies its burden of production, and rebuts the plaintiff's *prima facie* showing of discrimination, simply by introducing admissible evidence that, *if taken as true*, would *permit* a finding that the challenged employment action was taken for a legitimate, nondiscriminatory reason. *Mitchell v. Miller*, 884 F. Supp. 2d 334, 370 (W.D. Pa. 2012).

If the defendant meets its burden of production, the factual dispute is framed with "sufficient clarity" to provide the plaintiff with "a full and fair opportunity to demonstrate pretext." *Burdine*, 450 U.S. at 255-56. In order to establish that the defendant is liable for illegal employment discrimination, the plaintiff must ultimately convince the trier of fact that a discriminatory animus was the real reason for the adverse employment action at issue. *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994). Liability cannot be premised on a jury's mere disbelief of the defendant's explanation for an adverse employment action, but rather it must be based upon the jury's affirmative belief of the plaintiff's contention that the action was taken on the basis of an impermissible discriminatory criterion. *St. Mary's Honor Ctr.*, 509 U.S. at 519 ("It is not enough, in other words, to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination."). Nonetheless, evidence discrediting the defendant's proffered reason for the adverse action, when coupled with the plaintiff's *prima facie* case, may sufficiently undermine the employer's credibility to enable a reasonable trier of fact to conclude that illegal discrimination has occurred. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147-48 (2000).

Evidence used to establish a *prima facie* case of discrimination may also be relied upon to demonstrate pretext and vice versa, since nothing about the *McDonnell Douglas-Burdine* burden-shifting framework requires a court to ration the evidence presented in a particular case

among the *prima facie* and pretext stages of the analysis. *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 370 (3d Cir. 2008). Proof that an employer's explanation for an adverse employment action is unworthy of credence can be a powerful form of circumstantial evidence that is probative of intentional discrimination. *Reeves*, 530 U.S. at 147. Circumstantial evidence is not only sufficient to sustain a finding of liability for intentional discrimination, "but may also be more certain, satisfying and persuasive than direct evidence." *Desert Palace*, 539 U.S. at 100 (quoting *Rogers v. Mo. Pac. R.R. Co.*, 352 U.S. 500, 508 n.17 (1957)). Depending on the circumstances of the particular case, a plaintiff can sometimes prevail on the basis of circumstantial evidence without introducing "additional, independent evidence of discrimination." *Reeves*, 530 U.S. at 149. Whether summary judgment is warranted in a given case depends upon the strength of the plaintiff's *prima facie* case, the probative value of the evidence discrediting the defendant's proffered reason for the challenged employment action, and the presence or absence of additional evidence that may properly be considered by a court in determining whether a judgment as a matter of law is appropriate. *Id.* at 148-49.

**B.**    **Is There Sufficient Record Evidence to Raise an Inference of Unlawful Age Discrimination?**

Meyer was fifty-five years old at the time of his discharge. ECF Nos. 31 & 40 at ¶ 2. His age placed him within the category of persons entitled to statutory protection under the ADEA and the PHRA. 29 U.S.C. § 631(a); 43 PA. STAT. § 954(h). The termination of Meyer's employment with Herr-Voss obviously constituted an adverse employment action. *Herrnreiter v. Chicago Hous. Auth.*, 315 F.3d 742, 746 (7th Cir. 2002); *Sassone v. Quartararo*, 598 F. Supp. 2d 459, 466 (S.D.N.Y. 2009); *Mohamed v. Marriott Int'l, Inc.*, 905 F. Supp. 141, 154 (S.D.N.Y. 1995); *James v. Runyon*, 843 F. Supp. 816, 826 (N.D.N.Y. 1994). In order to establish a *prima facie* case under the ADEA and the PHRA, however, Meyer must point to

evidence which gives rise to an inference that he was discharged because of his age. *Royster v. Laurel Highlands Sch. Dist.*, 994 F. Supp. 2d 701, 709-10 (W.D. Pa. 2014).

Since this case arises out of a discharge, Meyer's qualifications for the relevant position have some bearing on whether an inference of discrimination can arise from the challenged employment action. *Howard v. Blalock Elec. Serv., Inc.*, 742 F. Supp. 2d 681, 700 n.9 (W.D. Pa. 2010) (observing that "consideration of the plaintiff's qualifications is appropriate at the *prima facie* stage" because "deficient qualification is among the most common reasons relied upon by employers for declining to hire specific applicants for employment"). Meyer was employed by Herr-Voss for a total of roughly twenty-five years. ECF Nos. 31 & 40 at ¶¶ 4-21, 72. During his tenure as a Herr-Voss employee, he served in various capacities and received several pay increases. *Id.* at ¶¶ 4-21. At least three merit-based pay raises were awarded to Meyer when he was the plant manager. *Id.* at ¶ 21. Herr-Voss concedes that Meyer was qualified to hold that position. ECF No. 30 at 4.

The most direct way for Meyer to establish a *prima facie* case of discriminatory discharge under the ADEA and the PHRA would be to demonstrate that the difference in age between him and his replacement was sufficiently great to create an inference that Herr-Voss acted on the basis of a discriminatory animus. *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013). Meyer is roughly four years and three months older than Bennett. ECF Nos. 31 & 40 at ¶¶ 2, 84. As a general rule, an inference of age-based discrimination does not arise when a discharged employee is replaced by an individual who is only five or six years younger. *Gutknecht v. SmithKline Beecham Clinical Labs., Inc.*, 950 F. Supp. 667, 672 (E.D. Pa. 1996).

In an attempt to use this tried-and-true method to establish a *prima facie* case of discrimination notwithstanding the minimal age difference between himself and Bennett, Meyer

maintains that he was not truly succeeded by Bennett. ECF No. 39 at 4-6. According to Meyer, his duties were assumed by his former assistant, Bruce Golojuh ("Golojuh"), after his departure. *Id.* During a deposition conducted on October 17, 2013, Golojuh testified that he was forty-eight years old. ECF No. 58 at 4. Therefore, he was either forty-six or forty-seven years old at the time of Meyer's discharge. An eight-year age difference between a terminated employee and his or her successor is ordinarily sufficient to create an inference of age-based discrimination. *Showalter v. Univ. of Pitts. Med. Ctr.*, 190 F.3d 231, 236 (3d Cir. 1999). Nevertheless, the record evidence simply fails to support Meyer's assertion that he was replaced by Golojuh.

Herr-Voss discharged Meyer on May 8, 2012. ECF Nos. 31 & 40 at ¶ 72. Bennett became the plant manager on August 27, 2012. ECF No. 57 at 8. Golojuh testified that he had temporarily performed some of Meyer's prior duties during the intervening three and one-half month period of time. ECF No. 58 at 6-7. The testimonial record reveals that the delay between Meyer's termination and Bennett's assumption of the position was attributable to Bennett's reluctance to take the job. Bennett testified that he had initially declined to be considered for the position when contacted by McKenna. ECF No. 57 at 71, 75, 77. Mostowy apparently convinced Bennett to accept the assignment at a later date. *Id.* at 78. Bennett also explained that his annual income had increased by roughly five to six thousand dollars as a result of his promotion. *Id.* at 87.

At the time of Golojuh's deposition, he was working as a manufacturing manager. ECF No. 58 at 4. He testified that he had held the same position prior to Meyer's discharge. *Id.* at 5. During his tenure as the plant manager, Meyer "prepared the daily black book."[5] ECF No. 41-1 at ¶ 2(a). Golojuh assumed that responsibility after Meyer's departure. ECF No. 58 at 9. The

---

[5] The "black book" apparently listed the total number of routers manufactured during the course of a typical workday. ECF No. 58 at 9.

mere fact that Golojuh started to complete the "black book" does not provide a basis for inferring that he was Meyer's *de facto* successor. Golojuh testified that he had previously prepared the "black book" while working under Meyer's predecessor, Ken Goehrings. *Id.* at 10. Although Meyer had performed that task during his tenure as the plant manager, Golojuh explained that the responsibility for maintaining the "black book" had returned to him after Meyer's removal. *Id.* Despite his performance of some minor record-keeping duties previously performed by Meyer, Golojuh responded in the affirmative when asked whether Bennett was Meyer's successor. *Id.* at 7.

The documentary record contains a generic job description describing the duties of a plant manager employed by Herr-Voss. ECF No. 41-14. When questioned by Meyer's attorney, Bennett acknowledged that his experience had not been diverse enough to cover each and every qualification listed on the job description. ECF No. 57 at 47-52. Meyer relies on that portion of the testimonial record as a basis for arguing that Bennett could not have been his actual replacement. ECF No. 39 at 4-5. That argument is unavailing. Since formal job descriptions often bear "little resemblance" to the duties that an employee is actually expected to perform, "the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of [his or her] professional duties." *Garcetti v. Ceballos*, 547 U.S. 410, 424-25 (2006). Burkhart has declared that the job description appearing in the record "does not constitute a list of mandatory prerequisites that an employee must possess prior to being promoted to the position" of plant manager. ECF No. 32-8 at 5, ¶ 27. The fact that Bennett's background did not match the job description in every respect does not cast doubt on the uncontradicted evidence establishing that he was ultimately chosen to succeed Meyer by his actually doing the job, and being paid for it.

15

Meyer insinuates that Bennett was chosen to be the new plant manager for the sole purpose of "masking" age-based discrimination. ECF No. 39 at 6. That suggestion is premised on a belief that Golojuh's qualifications for the position far exceeded those of Bennett. *Id.* The testimonial record, however, does not support Meyer's theory. When asked to compare his own qualifications to those of Bennett, Golojuh testified as follows:

> Q. In your opinion, sir, who is more qualified?
>
> A. I am.
>
> Q. Why do you say that?
>
> A. My experience, my education, but at the plant it's not all about one person. There is such a vast knowledge you need to have to machine and assemble and put stuff together, you need to—you need to be able to—you know, you have to be able—you have to be able to know about assembly and you have to be able to know about machining, and nobody knows everything about both. Mr. Bennett knows a lot more about assembly and setting up machines in the field than I do.
>
> Q. What part of the plant manager's job involves setting up machines in the field?
>
> A. Well, it involves supervising the guys building the machines, and if he can instruct them to do a certain—put something on in a certain way, it will help the people in the field as well as help them assemble the machines.

ECF No. 58 at 19-20. The testimony given by Golojuh suggests that his background in assembly was not comparable to that of Bennett. In a declaration executed on March 12, 2014, Mostowy stated that it had been his intention to hire a plant manager who had "extensive assembly experience." ECF No. 32-2 at 6, ¶ 37.

An employer's decision to hire an individual who does not meet the criteria appearing in a formal job description may alter the *prima facie* inquiry in some respects. When an employer hires an individual who does not meet the "objective qualifications" listed on a job posting, an unsuccessful applicant need not meet those qualifications in order to establish a *prima facie* case

of discrimination. *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 540-42 (3d Cir. 2006). In this case, however, Meyer's ability to serve as a plant manager is not questioned. ECF No. 30 at 4. The dispute between the parties centers on the identity of Meyer's successor, premised on his argument that Bennett could not have "really" been the plant manager because he was not good enough. In light of the overwhelming evidence demonstrating that Bennett actually succeeded Meyer as the plant manager,[6] Meyer cannot establish a *prima facie* case under the ADEA and the PHRA simply by hypothesizing that he was "really" replaced by Golojuh, particularly when neither Bennett nor Golojuh offers any factual basis to support that conclusion. Meyer's argument, which at its essence is a plea that "it just can't be so," simply does not have the necessary factual backup to hold water.

In the absence of evidence suggesting that he was replaced by a significantly younger individual, Meyer can nonetheless establish a *prima facie* case of age-based discrimination by making a more generalized showing that he was treated less favorably than younger individuals in his position. *Ashley v. Bayhealth Med. Ctr., Inc.*, 869 F. Supp. 2d 544, 551-52 (D. Del. 2012). We'll now consider the ways in which Meyer tries to do that. Most of them don't work, but one does.

### 1. **Statistics**

Proffered statistics do not bolster the position of either party. In a declaration submitted in support of Herr-Voss' motion for summary judgment, Burkhart identified several plant

---

[6] In their respective declarations, Mostowy and Burkhart both identified Bennett as Meyer's successor. ECF No. 32-2 at 6, ¶¶ 38-39; ECF No. 32-8 at 4, ¶ 19. Bennett testified that he had received and accepted an offer to serve as the plant manager. ECF No. 57 at 87. He explained that his pay had been increased as a result of the promotion. *Id.* Mostowy declared that he had sought to fill Meyer's prior position with someone who had "extensive assembly experience." ECF No. 32-3 at 6, ¶ 37. During a deposition, Golojuh acknowledged that his assembly experience did not match that of Bennett. ECF No. 58 at 20. Golojuh responded in the affirmative when asked whether Bennett was Meyer's replacement. *Id.* at 7. Meyer's contention that he was actually replaced by Golojuh is based entirely on hearsay. ECF No. 41-2 at 19. Although Meyer attributes certain statements to three of his former co-workers, he did not depose any of those individuals. *Id.*

managers who were either older than Meyer or only slightly younger than him. ECF No. 32-8 at 5-6, ¶¶ 29-30. Bill Donaldson, who was forty-four years old at the time of Meyer's discharge, was apparently the *youngest* person that Herr-Voss had in a similar position. *Id.* at 6, ¶ 31. Herr-Voss' oldest plant manager, Cal Chronister, was sixty-five years old. *Id.* at 5-6, ¶ 29. The remaining plant managers identified by Burkhart were roughly the same age as Meyer. *Id.* at 5-6, ¶¶ 29-30. When averaged together, the ages of Herr-Voss' other plant managers do not give rise to an inference of age-based discrimination, or a lack of such an inference. *Bleistine v. Diocese of Trenton*, 914 F. Supp. 2d 628, 639-40 (D.N.J. 2012) (recognizing that the average ages of comparators can be considered for the purpose of determining whether a plaintiff can establish a *prima facie* case of discrimination under the ADEA). While such raw, "rough and ready," unvalidated statistics do not compel (or perhaps even support) summary judgment for Herr-Voss, there is also nothing in them that bolsters Meyer's claims.

## 2. **Herr-Voss's Consideration of Repair Costs**

In his email to McKenna, Markle advised that it would cost Herr-Voss $7,312.80 to replace the VEL machine that needed to be discarded because of Meyer's error. ECF No. 32-5 at 8. Richard Pelloni ("Pelloni"), who was born on February 19, 1973, is roughly sixteen years younger than Meyer. ECF No. 60 at 4. At the time of Meyer's discharge, Pelloni was working as a mechanical engineer for Herr-Voss. ECF No. 56 at 56. McKenna was his second-level supervisor. *Id.* During a deposition, Pelloni acknowledged that one or two engineering mistakes generally occurred in connection with each project. ECF No. 60 at 33. In an attempt to demonstrate that Herr-Voss was more lenient with younger employees, Meyer contends that Pelloni was never disciplined for mistakes respectively costing the company $23,000.00 and $50,000.00. ECF No. 40 at ¶¶ 165, 169.

The testimonial evidence in this regard relied upon by Meyer simply fails to back up his assertions. According to Pelloni's deposition testimony, the "mistake" alleged to have cost Herr-Voss $23,000.00 was attributable to last-minute changes requested by a customer rather than to errors committed by Herr-Voss personnel. ECF No. 60 at 43-51. When Meyer's counsel suggested that a particular "mistake" had cost Herr-Voss $50,000.00, Pelloni expressly *disagreed* with that estimate, ECF No. 60 at 49, and McKenna declined to quarrel with that estimate only because Meyer's counsel had attributed it to Pelloni, ECF No. 56 at 57.

Santillo, who was born on June 1, 1976, is roughly nineteen and a half years younger than Meyer. ECF No. 59 at 4. He has previously worked as an application engineer and a project engineer for Herr-Voss. ECF No. 59 at 9-21. During the period of time relevant to this case, Santillo served as Herr-Voss' Director of Engineering and Sales. *Id.* at 21. Santillo testified that engineering mistakes made by him had cost Herr-Voss money. *Id.* at 26-27. Mistakes made by Herr-Voss' engineers, however, are not comparable to the mistake leading to Meyer's termination. The evidentiary record indicates that Meyer was discharged for failing to consult the responsible engineer before attempting to repair the defective key slot, and the resulting risk created by that failure to involve engineering in the repair decisions. ECF No. 32-1 at 63-65; ECF No. 32-2 at ¶¶ 15-32; ECF No. 32-5 at 8-10; ECF No. 32-6 at ¶¶ 9-11; ECF No. 32-8 at 15. Thus, Herr-Voss' engineers and Meyer were not similarly situated, and Meyer cannot establish a *prima facie* case of age-based discrimination by relying on Herr-Voss' alleged willingness to incur the costs of the errors committed by Pelloni and Santillo. *Davis v. Pitts. Pub. Sch.*, 930 F. Supp. 2d 570, 600 (W.D. Pa. 2013).[7]

---

[7] While at first glance, this is a closer call, Meyer's argument in this regard fails to focus on an important distinction. While Santillo's mistakes may have cost Herr-Voss money, it is plain from the record that no matter the approximately $7,000 cost to Herr-Voss of the "re-work" here, and whether it had been done or not, Meyer was in hot water because in the expressed judgment of his superiors, he had directed a repair (1) outside of engineering

### 3. **Was Mostowy Correct in His Judgment?**

As noted above, in order to rebut a plaintiff's *prima facie* case of discrimination, an employer "must clearly set forth, through the introduction of admissible evidence," its reason for taking the relevant adverse employment action. *Burdine*, 450 U.S. at 255. In addition, such evidence may also be considered as part of the calculus in assessing whether there is evidence that creates a permissible inference of discrimination for *prima facie* case purposes. *Reeves*, 530 U.S. at 148-49. Meyer advances other record evidence that he says establishes a *prima facie* case under the ADEA and the PHRA, and shows that the decision to discharge Meyer was pretextual.

Meyer attacks whether Mostowy was "right" in concluding that he (Meyer) had placed others in danger. The evidentiary record demonstrates that Mostowy made the decision to discharge Meyer. ECF No. 32-2 at 5, ¶¶ 27-28; ECF No. 32-8 at 3, ¶ 12; ECF No. 56 at 4. In his declaration, [8] Mostowy stated that Meyer had been terminated for creating "an unnecessary and unacceptable risk" to the lives of Herr-Voss' employees and customers. ECF No. 32-2 at 4, ¶¶ 25-26. Mostowy declared that he decided to fire Meyer because Meyer's "uninformed decision to have the defective key slot welded could have resulted in someone being killed." *Id.* at 5, ¶ 33. The information relied upon by Mostowy was provided by Menego, who warned that

---

protocols and (2) in a way that Meyer's superiors were told would place end users in grave danger. A *prima facie* case of discrimination cannot be premised solely on Meyer's subjective belief that the challenged employment action was made on the basis of an impermissible discriminatory criterion. *Hubbell v. World Kitchen, LLC*, 688 F. Supp. 2d 401, 431-32 (W.D. Pa. 2010). More than his speculation is required to shift the burden of production to Herr-Voss, or to meet the "but for" causation test under the ADEA. *See Bullock v. Children's Hosp. of Phila.*, 71 F. Supp. 2d 482, 490 (E.D. Pa. 1999).

[8] It does strike the Court as rather unusual that neither party deposed Mostowy, the decision maker.

Meyer's unauthorized "repair" of the key slot "could have had severe and dangerous consequences." *Id.* at 4, ¶ 18.[9]

Meyer contends that the record contains no evidence demonstrating that his actions "created an inherently dangerous and unsafe work environment." ECF No. 39 at 11. Menego died before the completion of discovery in this case. ECF No. 59 at 22-23; ECF No. 60 at 52-53. In the message emailed to McKenna on June 26, 2012, Santillo stated that the key slot improperly welded by Meyer was "vital to the structural integrity of the machine." ECF No. 32-1 at 63. Santillo went on to assert that a "failure" in the key slot would put the machine's frame in an "uncontrollable state," thereby resulting in a "very hazardous safety situation." *Id.* He stood by those statements during the course of a subsequent deposition. ECF No. 59 at 80. Santillo testified that the modifications made by Meyer had made it more likely that the key slot would fail. *Id.* at 89, 92. Nonetheless, Santillo acknowledged that no tests had been performed to confirm his conclusions. *Id.* at 92.

Meyer apparently believes that his actions did not actually cause the risks described by Menego and Santillo. ECF No. 39 at 11. The correctness of Herr-Voss' decision in that regard, however, is not what matters. *Mitchell v. City of Pitts.*, 995 F. Supp. 2d 420, 434 (W.D. Pa. 2014). The Court does not sit as an arbitral board empowered to weigh the strength of the scientific conclusions underpinning Herr-Voss' decision to discharge Meyer. *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997). The existence or absence of

---

[9] Standing alone, the statements contained in Mostowy's declaration would be "legally sufficient" to justify a judgment in favor of Herr-Voss, fulfilling its obligation to advance a legitimate, nondiscriminatory reason for Meyer's dismissal. *Burdine*, 450 U.S. at 255. Assuming that Meyer established a *prima facie* case of age-based discrimination, as noted below he can defeat the motion for summary judgment by either discrediting Herr-Voss' proffered reason for his discharge or affirmatively demonstrating that a discriminatory animus was a "determinative cause" of Mostowy's decision. *Fuentes*, 32 F.3d at 764. "In certain instances, a plaintiff's *prima facie* case, when combined with evidence suggesting that an employer's proffered reason for an adverse employment action is false, may enable a reasonable trier of fact to conclude that unlawful discrimination has occurred." *Toth v. California Univ. of Pa.*, 844 F. Supp. 2d 611, 645 (W.D. Pa. 2012).

discrimination does not turn on the ultimate truth or falsity of the information relied upon by an employer as a basis for making an employment decision. *Daniels v. Sch. Dist. of Phila.*, 982 F. Supp. 2d 462, 487 (E.D. Pa. 2013). In this context, a *wrong* decision cannot be equated with a discriminatory decision. *Pridgen v. Green Valley SNF LLC*, 756 F. Supp. 2d 614, 621 (D. Del. 2010). The focus as to this question is whether Menego and Santillo actually believed the conclusions that they reached, and Meyer has not advanced sufficient record evidence to allow a jury to conclude that they did not. The lack of empirical, calculated scientific data confirming the theories articulated by Menego and Santillo provides no support for Meyer's contention that he was discharged because of his age.

Changing gears, and in a further attempt to destroy the factual predicate for Mostowy's discharge decision, Meyer suggests that Menego's death has rendered it impossible for Herr-Voss to establish the authenticity of the message sent to McKenna on May 1, 2012. ECF No. 39 at 11. Menego's authorship of the message, however, was discussed and confirmed during McKenna's deposition. ECF No. 56 at 7-8. Mostowy later declared that he had spoken with Menego about the contents of the message. ECF No. 32-2 at 3-4, ¶¶ 14-20. Considered together, that gets the email message over the authenticity hurdle. FED. R. EVID. 901(b)(1). Then, because Menego's statements are being offered by Herr-Voss to demonstrate their effect on Mostowy's decision, rather than to prove the ultimate truth of the matters asserted in them, they do not constitute inadmissible hearsay. FED. R. EVID. 801(c)(2); *see Faulkner v. Super Valu Stores, Inc.*, 3 F.3d 1419, 1434-35 (10th Cir. 1993); *Architectural Testing, Inc. v. Unemployment Comp. Bd. of Review*, 940 A.2d 1277, 1282 (Pa. Commw. Ct. 2008).

Trying another approach, Meyer attacks Herr-Voss's asserted "get engineering involved" policy. Mostowy's decision to terminate Meyer was also premised on Meyer's alleged failure to

follow a policy requiring "shop employees" to consult with the "engineer responsible for a machine's design prior to making a deviation from a drawing or a repair." ECF No. 32-2 at 4, ¶ 22. Meyer suggests that no such policy existed. ECF No. 39 at 10. Although McKenna acknowledged that Herr-Voss had no written policy requiring employees to speak with engineers before making modifications to products, he testified that it was standard procedure for engineers to be consulted about such modifications. ECF No. 56 at 49. Markle similarly testified that Meyer should have spoken with an engineer before proceeding with the attempted repair. ECF No. 41-6 at 10. An employee cannot establish the existence of discrimination merely by showing that the standards used to judge his or her performance were not in writing, or similarly lacking in specificity. *Hodczak v. Latrobe Specialty Steel Co.*, 451 F. App'x 238, 242 (3d Cir. 2011); *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 321 (3d Cir. 2000).

Meyer evidently discussed the proposed repair with Markle. ECF No. 32-1 at 64; ECF No. 32-5 at 8. The record contains conflicting evidence concerning the nature of Markle's involvement in the decision to authorize the repair. Meyer testified that he had obtained Markle's approval before welding the defective key slot. ECF No. 41-2 at 8-9. Markle denied that he had participated in the decision to proceed with the repair suggested by Meyer. ECF No. 32-6 at 3, ¶ 10. Because Herr-Voss is the party moving for summary judgment, Meyer's testimony concerning his alleged communications with Markle must be credited at this stage. *Thompson v. Wagner*, 631 F. Supp. 2d 664, 681-82 (W.D. Pa. 2008). The undisputed testimonial evidence, however, indicates that Markle actually but mistakenly believed that Meyer's idea had already been approved by an engineer. ECF No. 32-6 at 2-3, ¶¶ 6-11; ECF No. 56 at 32. Even when this evidence is viewed in the light most favorable to Meyer, it does not undermine

Mostowy's assertion that Meyer was discharged for "eschew[ing] protocol" and welding the key slot without an engineer's consent. ECF No. 32-2 at 4, ¶¶ 22-23.

Alluding to Markle's alleged awareness of the proposed repair, Meyer points out that Markle was never disciplined for failing to intervene. ECF No. 39 at 13. Nevertheless, Markle is two or three years older than Meyer. ECF No. 32-8 at 6, ¶ 33. As discussed earlier, the ADEA does not prohibit discriminatory practices "favoring the old over the young." *Gen. Dynamics*, 540 U.S. at 584. It is difficult to fathom how Meyer believes that the difference between the discipline imposed on him and the leniency shown to the older Markle supports his allegation that Herr-Voss discharged him *because of his age. Hodczak*, 451 Fed. App'x at 242.[10]

### 4. Did Mostowy Apply a Double Standard?

Meyer points to the testimonial record which demonstrates that in March 2012, McKenna (who was 49 years old when Meyer was discharged, ECF 31 at ¶ 121) was charged with driving under the influence of alcohol.[11] ECF No. 56 at 24. The incident occurred while McKenna was operating a company vehicle in Beaver County, Pennsylvania, after leaving a retirement party sponsored by Herr-Voss. *Id.* at 24-26. Herr-Voss took no disciplinary action against McKenna. *Id.* at 24. None. McKenna was also permitted to continue to drive company vehicles after the incident. *Id.* Relying on Mostowy's failure to discipline McKenna at all for placing others at risk of injury or death by this conduct, Meyer insists that his decision to weld the key slot was merely used as a pretext to mask a discriminatory discharge. ECF No. 39 at 13-14. Herr-Voss argues that Meyer cannot impugn Herr-Voss' proffered reason for discharging him by pointing

---

[10] In the same vein, Gary Hart ("Hart"), a former President of Herr-Voss, testified that plant managers had sometimes been expected to act outside of their respective areas of expertise in order to complete work orders. ECF No. 41-3 at 4. The testimony given by Hart, however, does not undermine Herr-Voss' assertion that *Mostowy* terminated Meyer because of his failure to call the proposed repair to an engineer's attention. Indeed, Hart acknowledged that he did not know whether Herr-Voss maintained a policy requiring an employee in Meyer's position to initiate communications with an engineer before proceeding with such a repair. *Id.* at 12.

[11] 75 PA. CONS. STAT. § 3802.

to its failure to discipline McKenna for driving under the influence of alcohol. Herr-Voss argues that while McKenna's misconduct occurred within the context of a company-sponsored event, it did not relate to the quality of his work or to products manufactured by Herr-Voss, and therefore is neither supportive of an inference of discrimination, or of pretext. *Straka v. Comcast Cable*, 897 F. Supp. 2d 346, 362 (W.D. Pa. 2012) (observing that a plaintiff's evidence was "not probative of discriminatory animus based on age" because he had "failed to select comparators who were treated differently under similar circumstances"); *Maull v. Div. of State Police*, 141 F. Supp. 2d 463, 479-80 (D. Del. 2001).

For the reasons discussed earlier, Meyer cannot establish a *prima facie* case of age-based discrimination under the ADEA and the PHRA based on the age of his replacement. But Meyer can establish a *prima facie* case of discrimination by producing evidence sufficient to enable a reasonable trier of fact to conclude, by a preponderance of the evidence, that Herr-Voss treated him differently and that it did so because of his age. *Lupyan v. Corinthian Colls., Inc.*, 761 F.3d 314, 324 (3d Cir. 2014).

Mostowy was not deposed by any party in this case. The Defendant did however submit his declaration, ECF No. 32-2, laying out chapter and verse why he made the decision to fire Meyer. Critically, he states that Menego told him (Mostowy) that "Plaintiff's attempted repair of the Machine, if left uncorrected, could have had severe and dangerous consequences." ECF No. 32-2 at ¶18. He goes on to say that "given the extreme risk associated with Plaintiff's decision, I believed that Plaintiff had endangered the lives of Herr Voss's workforce, as well as the lives of any potential client who may have purchased the Machine from Herr Voss." ECF No. 32-2 at ¶25. These statements appear to be completely consistent with Herr Voss's "Safety" Policy, ECF No. 41-11, particularly its provisions which provide that "[e]mployees who violate safety

standards, who cause hazardous or dangerous situations, or who fail to report or, where appropriate, remedy such situations, may be subject to disciplinary action, up to and including termination of employment." ECF No. 41-11 at 1. That same provision warns all employees that "[n]o action should be undertaken which would knowingly be harmful or potentially unsafe." *Id.* These expectations apply such that "[e]ach employee is expected to obey all safety rules and to exercise caution in all work activities or during any time while on Company property." *Id.*

Differential treatment of similarly-situated employees is a prevalent method of demonstrating the requisite nexus between the statutory attribute at issue (here, age) and the challenged employment action. *See Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 366 (3d Cir. 2008). One way that this can be shown is with competent evidence that the employer employed a "double standard" between such employees. *Waldron v. SL Indus., Inc.*, 56 F.3d 491, 499 (3d Cir. 1995); *see also Ferrigno v. Franklin Grp., Inc.*, No. 08-1140, 2010 WL 1136293 (W.D. Pa. Mar. 1, 2010) *report and recommendation adopted*, No. 08-1140, 2010 WL 113431 (W.D. Pa. Mar. 23, 2010); *Stahlnecker v. Sears*, No. 08-681, 2009 WL 661927, at *6-7 (E.D. Pa. Mar. 11, 2009). While most often an analysis applied in the third or "pretext" stage of a *McDonnell Douglas* discrimination case, that same proof may, of course, also be considered as to the *prima facie* case, as noted above. In short, it can have more than one use in the "shifting burdens" analysis.

Herr Voss's conclusory argument, ECF No. 51 at 7-8, that the situations involving Meyer's machine repairs (a "work activity") and McKenna's drunk driving in a company car after a company event (also a "work activity") are not "similar" and that Meyer and McKenna therefore cannot be "similarly situated" ring hollow. Both were senior managers, relatively high up in the organization. Decisions regarding their employment status, and as to the consequences

of any misconduct on their part, were directly made by exactly the same person, CEO Mostowy. Those decisions were made only two (2) months apart. Mostowy set the bar in applying the Defendant's stated expectations regarding "safety"—that is when a senior manager's actions "endangered lives", and could have "severe and dangerous consequences", termination is in order. Drawing all reasonable inferences, as we must, in favor of Meyer, the conduct of each risked exactly that same high level of serious harm to others while engaged on behalf of Herr-Voss. In these regards, McKenna and Meyer were "alike in all relevant respects." *See Royster v. Laurel Highlands Sch. Dist.*, No. 14-1373, 2014 WL 6985724, at *2 (3d Cir. Dec. 11, 2014)

It certainly is possible that there is a factual explanation why it was that Meyer's conduct generated the conclusion that his dismissal was merited, and that McKenna's conduct (a blood alcohol level at about twice the lawful limit, while driving a company car from a company function on the public highways) did not warrant even a slap on the wrist, even though it would appear to have created just such risks to others. Whatever that fact-based explanation is or could be, it is not in the record, nor is it at all obvious to the Court.

Was there a "double standard" in use? Maybe yes, maybe no. On that question, there is in the Court's estimation plainly a genuine issue of material fact, and as such, there is sufficient evidence from which it can be concluded that Meyer has both made out his prima *facie case*, and, assuming that Herr Voss has articulated a legitimate, non-discriminatory reason for Meyer's dismissal, provided evidence supportive of his "pretext" argument. As to the pretext analysis— that is whether Defendant's reasons are "unworthy of credence", given that the same top-level decision maker that fired Meyer for risking serious harm to others (in the same timeframe)[12] did

---

[12] In the Court's judgment, this consideration of temporal proximity is critical. Otherwise, a single employment decision could become the measuring stick for every decision made thereafter into time immemorial. Here, the same decision maker was confronted with two (2) senior managers taking high risk actions involving the

nothing at all as to another senior manager that would have appeared to do likewise, albeit in a different fashion—Meyer has met his burden as to showing sufficient evidence of both an inference of discrimination, and pretext, to avoid summary judgment. Thus, Herr Voss's motion for summary judgment must be denied.

### C.     The Defendant's Motion Seeking the Exclusion of Plaintiff's Damages Evidence

Federal Rule of Civil Procedure 37(b)(2)(A)(ii) provides that a party who fails to comply with an order permitting discovery may be prohibited "from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence." FED. R. CIV. P. 37(b)(2)(A)(ii).  Relying on Rule 37(b)(2)(A)(ii), Herr-Voss seeks an order prohibiting Meyer "from pursing his claim for, or introducing into evidence information on, alleged lost wages as a measure of damages in this matter." ECF No. 33 at 16, ¶ 49.  Herr-Voss' request for such an order is premised on alleged violations of prior orders relating to discovery.

The guts of the Defendant's Motion is that at trial, presumably, Meyer will seek to recover statutorily authorized damages, which would include back pay or other versions of lost income. It is hornbook law that, while such damages are recoverable, they are to be reduced by the amount of actual interim earnings, or reasonably achievable interim earnings, earned or not. This is the doctrine of mitigation of damages.

In order to determine what might be coming, in discovery the Defendant asked Meyer for that information in a series of interrogatories and document requests, and at Meyer's deposition. Defense counsel used terms such as "wages," "earnings," "income," and "self-employment income" in making those inquiries. Meyer in response says that he produced income tax returns that would reveal some or all of that information, including tax returns for the limited liability

Defendant's business and "work activities," only a few months apart.  The older one lost his job, the younger one avoided any sanction at all.  That is what creates the genuine issue of material fact.

company ("LLC") of which he is a 50% owner. It appears that at his deposition, when Plaintiff was quizzed about those documents, his counsel interposed one or more objections, generically on the basis that there had been no showing by Herr-Voss's counsel that Meyer had the necessary knowledge or "expertise" to explain one or more entries on his own business's tax return. Further, Meyer's counsel appeared to put Defendant's counsel to the test as to what was meant by the term "income" as to certain discovery requests, and then disputed the Defendant's characterization of any earnings by Meyer as being from "self-employment." ECF No. 33 at 17.

The Court has carefully reviewed the filings of the parties on these issues, ECF Nos. 33, 49, along with all of the back-up documentation annexed to them, ECF No. 33-1 to 33-15. The Plaintiff's position is untenable. First, from a common sense perspective, it is likely that the Internal Revenue Service would have a very big problem with a taxpayer[13] who claims that he cannot account for one or more entries on his own partnership tax return, one for a very small business that he owns and runs with a member of his own family. It also appears to the Court that this is a dispute that has its genesis in the Plaintiff's (and his counsel's) hyper-technical reading of rather fundamental and rudimentary discovery requests and deposition questions about what Meyer has been doing to earn money since he was fired, and how much he did earn and could have earned since then.[14] These are routine discovery inquiries that are neither nuanced, nor novel. The Court concludes that the discovery requests directed to this topic, while perhaps not perfectly worded, were by any measure sufficiently specific and understandable, and the cagey and evasive "dodgeball" responses both by the Plaintiff, and as interposed by his

---

[13] On the tax return for the business in which Plaintiff is a one-half owner, he is designated as the responsible person to address any tax issues which the IRS might have. ECF No. 33-12 at 3 (designating the Plaintiff as the "Tax Matters Partner" to the IRS).

[14] ECF No. 11 shows a series of regular, periodic "draws" to/by the Plaintiff, which add up to more than $40,000.00

lawyer in the form of one or more discovery objections, are sufficiently contrary to the applicable discovery rules and the directives of this Court so as to require appropriate remedial action. Civil discovery is not a game of "Guess the Magic Number," and Plaintiff may not make the proceedings more time-consuming and expensive by requiring the Defendant to chase its own tail as it tries to get straight answers to simple questions.[15]

Herr-Voss says that the only proper action is to bar Meyer from presenting any evidence of his own damages, given that he has been less than forthcoming about what he has done to mitigate them. While that would be an available course of action, from the Court's perspective, it is overkill, at least at this point. Any remedial action by this Court must be precisely tailored to address the problem created by the Plaintiff.

The correct course is that the Plaintiff will be obligated to gather and then deliver to counsel for the Defendant, within twenty-one (21) days of this Order, (1) all documents (for the period beginning one year prior to the date of the termination of the Plaintiff's employment by the Defendant to date of production, and thereafter through trial) that reflect any funds received from any source for any services performed by the Plaintiff (other than for Herr Voss), no matter who was the initial or other recipient of such funds or the nature of the services performed, and (2) all business records (covering the same time period) of any business or other entity in which the Plaintiff has any ownership (or other interest or level of control) showing any funds received or disbursed by such business or other entity for any purpose or reason, and all personal financial records (for the same time period) of the Plaintiff that reflect any funds received by him from any source (other than Herr Voss) for any services performed by him or which had as their

---

[15] It appears from the record that the discovery process had more than its fair share of jousting between counsel, and the oral argument in this case was punctuated by such a startling and uncharacteristic level of contentiousness by counsel toward one another and the Court that it necessitated the Court's raising, on the record, the specter of dual contempt citations. The Court fired its last, and only, "warning shot" in such regards at that argument when it directed counsel to knock it off.

direct or indirect source any business or entity in which the Plaintiff has any ownership or other interest or control.

Then, at the election of counsel for Herr-Voss, upon notice given within twenty (20) days of the Plaintiff's last production of such documents, Herr-Voss may conduct a renewed oral deposition of Meyer as to such matters and materials, without regard to any day or time limits on oral depositions otherwise provided by any applicable Civil Rule. To the extent that Meyer takes the position that he is without sufficient knowledge or "expertise" to readily explain the content of such newly-produced records, or records (including tax returns) previously produced, he shall designate and make available one or more knowledgeable person or persons to counsel for the Defendant, specifying the matters to which such other person or persons has the requisite knowledge or expertise, and thereafter, Herr-Voss may take such person(s)' oral deposition in such regards. To the extent any such depositions are taken, all expenses for the attendance of the reporter, the preparation of the transcript (at regular, ordinary rates), along with any witness fees/expenses, shall be borne by the Plaintiff.

The Court concludes that this directive strikes the proper balance between enforcing the discovery obligations of the Federal Rules of Civil Procedure and those imposed by this Court, and assuring that any such measures "fit" the specific facts involved. The Court further concludes that any additional or further remedy is not necessary, at this point, in order to fulfill those goals.

When a court's order authorizing discovery is knowingly disobeyed, "the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." FED. R. CIV. P. 37(b)(2)(C).

An award of attorney's fees is appropriate when a party commits a "clear violation" of an order requiring the production of specific documents. *McLaughlin v. Phelan Hallinan & Schmieg, LLP*, 756 F.3d 240, 249 (3d Cir. 2014). Herr-Voss requests such an award based on alleged violations of an order entered on November 13, 2013, and orally ordered on January 10, 2014. ECF No. 33 at ¶¶ 9, 27, 47, 50. ECF Nos. 33 & 49. The propriety of sanctions in this case is committed to the discretion of the Court. *Grider v. Keystone Health Plan Cent., Inc.*, 580 F.3d 119, 134 (3d Cir. 2009). Under the present circumstances, a general award of attorney's fees would be inappropriate. However, an award of fees relative to the renewed discovery now ordered by the Court is appropriate, since that follow-up discovery is necessitated by the Plaintiff's actions. Therefore, should the Defendant actually take one or more of the depositions authorized by this Opinion, Plaintiff is ordered to compensate the Defendant for a total of up to and including six (6) hours of counsel fees for actually taking these follow-up depositions, for one (1) of Defendant's lead counsel who actually takes such deposition(s), at such counsel's hourly rate as actually charged to the Defendant in this case. Herr-Voss's request for such a further award of attorney's fees will otherwise be denied without prejudice.

## V.    CONCLUSION

For the foregoing reasons, the motion for summary judgment filed by Herr-Voss (ECF No. 29) will be denied. The motion requesting the exclusion of evidence (ECF No. 33) will be granted in part and denied in part. Herr-Voss' request for an award of attorney's fees will be granted in part, and the balance denied in part without prejudice.

Mark R. Hornak
United States District Judge

Dated: January 5, 2015

cc:    All counsel of record